**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

---

No. 03-2370

AZEB GEBRE CHEBUDE,

Petitioner,

v.

JOHN ASHCROFT, Attorney General,

Respondent.

---

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

---

Before

Lynch, Lipez, and Howard,
Circuit Judges.

---

Genet Getachew on brief for petitioner.

Earle B. Wilson, Senior Litigation Counsel, Office of
Immigration Litigation, Terri J. Scadron, Assistant Director, and
Peter D. Keisler, Assistant Attorney General, on brief for
respondent.

---

August 10, 2004

---

**LYNCH**, **Circuit Judge**.  Petitioner Azeb Gebre Chebude, a native and citizen of Ethiopia, is of Eritrean descent.  In July 2000, shortly after a two-year war between Ethiopia and Eritrea ended, Chebude left Ethiopia and attempted to enter the United States using fraudulent documents.  The INS detained her and commenced removal proceedings.  Chebude conceded removability but sought asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") on the ground that, as a person of Eritrean origin, she would face discrimination and potential deportation to Eritrea upon her return.  An Immigration Judge denied each form of relief on March 19, 2002.  Chebude appealed the denial of her asylum claim to the Board of Immigration Appeals (BIA), which affirmed the IJ's decision on September 8, 2003.  Because a number of Chebude's arguments on appeal were not raised in her briefs to the BIA, and substantial evidence supports the BIA's rejection of those arguments that she did raise, we affirm.

**I.**

Fighting between Ethiopia and Eritrea broke out in 1998.  Chebude, who was the sole witness at her removal hearing, testified that her mother is Eritrean and her father is Amharic.  Chebude testified that she lost her job as a secretary in August 1999 because her employer was afraid he would be investigated by the government for hiring Eritreans.  She further testified that, also in August 1999, the police arrested two of her three brothers and

forcibly deported them.  Although she, her mother, and Yadic, her remaining brother, were present during one of the arrests, they were not taken.  According to Chebude, her mother was too elderly and Yadic was too sick to be taken, and Chebude herself was not taken because she was the only person available to care for them.

Over the next several months, she said, the Ethiopian police came repeatedly to her house to deport her.  The first time, she testified, she was at the hospital caring for Yadic, so they did not find her.  The second time, she testified, they again did not take her because Yadic had recently passed away and she was in mourning.  After the forty-day mourning period had passed, she went into hiding.  During that time, she testified that her mother told her that government agents had twice come to their house to inquire as to her whereabouts.

According to the State Department's country conditions report for Ethiopia in 2001, the conflict between Ethiopia and Eritrea lasted through June 2000, when the two nations signed an agreement ending hostilities.  The report notes that during the conflict, many Ethiopians of Eritrean origin lost their jobs and access to government services, and as many as 75,000 were detained and forcibly deported.  The report goes on to note that "the Government stopped forcibly deporting Eritreans and Ethiopians of Eritrean origin after it signed the cessation of hostilities

agreement with Eritrea in June 2000" and that 2,892 such persons were repatriated in 2000.

On March 19, 2002, the IJ denied Chebude's petition for asylum and withholding of departure. Although he found Chebude to be a "credible witness," he concluded that she lacked a well-founded fear of future persecution. He determined that the evidence was not sufficient to demonstrate that Chebude had been subjected to past persecution. He described Chebude's allegations that authorities repeatedly tried to deport her as "speculative" and noted that, in any event, she had not been deported. The IJ also determined that Chebude was unlikely to be persecuted upon her return, citing State Department country conditions reports that Ethiopia and Eritrea had signed a peace agreement and that Ethiopia had stopped deporting individuals of Eritrean descent. The IJ further stated that "[t]here is no evidence that Ethiopians [of] Eritrean descent are being denied housing or education or employment at the present time" and that Chebude's evidence on that point was "strictly an[ec]dotal and unsubstantiated." In addition, the IJ denied Chebude's CAT petition on the ground that there was no evidence that Chebude faced torture upon her return to Ethiopia.

On April 9, 2002, Chebude appealed from the IJ's denial of her petition for asylum. She did not challenge the IJ's denial of her petition for withholding of departure or CAT protection. In her brief to the BIA, she stated, "The only issue in the instant

case is whether conditions have changed in the Respondent's country . . . to permit the Respondent to return to her country of nationality without fear."  She argued that the "INS has not established by preponderance of evidence [that] the government of Ethiopia has stopped deporting Ethiopians of Eritrean origin." Chebude's brief did not challenge the IJ's finding that she had not suffered past persecution or the IJ's conclusion that there was no evidence that Ethiopians of Eritrean descent were still being denied housing, education, and employment at that time.

On September 8, 2003, the BIA affirmed the IJ's denial of asylum.  The BIA held that Chebude bore the burden of demonstrating a well-founded fear of future persecution "because the Immigration Judge correctly determined that she did not establish past persecution."  Citing the State Department's country conditions report, the BIA determined that Chebude had not met that burden.

## II.

We review the BIA's decision under the deferential substantial evidence standard. Pieterson v. Ashcroft, 364 F.3d 38, 43 (1st Cir. 2004).  Under that standard, we must affirm the BIA unless the evidence not only supports a contrary conclusion, but compels it.  Id.; see also INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992).  Where, as here, the BIA adopted the IJ's reasoning, we review that reasoning as if it were articulated by the BIA in the first instance. Pieterson, 364 F.3d at 43 n.2.

To be eligible for asylum, an applicant bears the burden of establishing that she meets the statutory definition of a refugee under 8 U.S.C. § 1101(a)(42)(A).  See 8 C.F.R. § 208.13(a). To satisfy that definition, the applicant must demonstrate "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A); see also 8 C.F.R. § 208.13(b); Khem v. Ashcroft, 342 F.3d 51, 53 (1st Cir. 2003).  That fear can be demonstrated in two ways.  First, the applicant can demonstrate past persecution on one of the five statutory grounds. Such a showing creates a presumption of a well-founded fear of future persecution.  8 C.F.R. § 208.13(b)(1); Khem, 342 F.3d at 53. Second, the applicant can establish a genuine and objectively reasonable fear of future persecution.  8 C.F.R. § 208.13(b)(2); El Moraghy v. Ashcroft, 331 F.3d 195, 202-03 (1st Cir. 2003).

Chebude contends that she has met her burden here.  She raises two new arguments regarding her asylum claim that were not articulated in her brief to the BIA: (1) that she demonstrated past persecution based on the deportation of her brothers and the Ethiopian government's repeated attempts to deport her, and (2) that she established a genuine and objectively reasonable fear that, as an Ethiopian of Eritrean origin, she would be deprived of housing, employment, access to government services, her right to vote, and her citizenship if returned to Ethiopia.  We decline to

-6-

consider either argument.  Arguments not raised to the BIA are waived for failure to exhaust administrative remedies.  Opere v. INS, 267 F.3d 10, 14 (1st Cir. 2001); Bernal-Vallejo v. INS, 195 F.3d 56, 64 (1st Cir. 1999).  That Chebude mentioned these arguments in her notice of appeal to the BIA does not excuse her failure to raise them in her brief to the BIA.  See Cumberland Farms, Inc. v. Montague Econ. Dev. and Indus. Corp., 78 F.3d 10, 12 n.1 (1st Cir. 1996) (holding that appellant waived an issue raised in its notice of appeal when it did not refer to the issue in its brief).

The only argument that Chebude raised to the BIA was that the State Department's country conditions report did not suffice to negate her genuine and objectively reasonable fear of deportation upon her return to Ethiopia.  Substantial evidence supports the BIA's rejection of this argument.  The 2001 country conditions report states that "the Government stopped forcibly deporting Eritreans and Ethiopians of Eritrean origin after it signed the cessation of hostilities agreement with Eritrea in June 2000" and that 2,892 such persons were repatriated in 2000.  It also states that 80,000 to 100,000 individuals of Eritrean descent continued to reside in Ethiopia as of the date of the report in 2001.  Chebude conceded in her testimony to the IJ that "[a]t this moment currently the government is not directly deporting people from Ethiopia to Eritria."

The country conditions report does mention that "Ethiopians of Eritrean origin have been able to obtain exit visas [to leave Ethiopia] but often are not permitted to return to the country." That statement, though, does not indicate that Ethiopia has resumed deportations. There are concerns that the peace between Eritrea and Ethiopia may not last. But we cannot say that those concerns compel the conclusion that Chebude would likely face deportation upon returning to Ethiopia.

Chebude also argues that she is entitled to withholding of departure. That claim has been waived, as she did not challenge the IJ's denial of that relief in her petition to the BIA. Opere, 267 F.3d at 14.

## III.

The BIA's denial of asylum is **affirmed**.